Thomas C. Frost, Esq. (CA Bar No. 185187)
Craig H. Wendland, Esq. (CA Bar No. 254118)
THE FROST FIRM
1010 Second Ave., 24th Floor
San Diego, CA 92101
Telephone: (619)822-1740
Facsimile: (619)822-1744

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAN BRANDRUP, an individual, NICKLAS BRANDRUP, an individual, HYPERIKON, INC., a California Corporation, <br><br> Plaintiffs <br><br> vs. <br><br> ALVIN GOMEZ, an individual, FERNANDO TRUJILLO GRUMBIONIN a/k/a GRUMBIANIN a/k/a GRUMBIANINI, an individual, ROBERT KENYON, an individual, PLATINUM LED US, INC., a California Corporation, and DOES 1-10 inclusive, <br><br> Defendants | Case No. **'13 CV 2254 BTM BGS** <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

Plaintiffs JAN BRANDRUP, NICKLAS BRANDRUP, and HYPERIKON, INC., by and through their attorneys, THE FROST FIRM, complaining of the above-named Defendants (collectively referred to as "Defendants"), as and for their Complaint allege, upon information and belief except as otherwise particularly stated, as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over these claims for violations of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, and violations of the Securities and Exchange Act of 1933, 15 U.S.C. § 77a, and Regulation D, 17 C.F.R. § 230.500, which raise federal questions pursuant to 28 U.S.C. § 1331.   This Court may exercise ancillary and pendent jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

2.     This Court has personal jurisdiction over each of the Defendants because at all times relevant to this Complaint they conducted systematic and continuous business in California in this District and maintained principal places of business in this District.  The individual Defendants also have purchased and maintained real and personal property in this District.  Moreover, this Court has personal jurisdiction over all Defendants pursuant to 15 USC § 78aa because all Defendants inhabit, permanently reside in, and may be found in California in this District, and the acts and transactions constituting the alleged violations of the Securities and Exchange Acts of 1934 and 1933 occurred in California in this District.

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Defendants are conducting substantial business activities within this District; all Defendants reside and are domiciled in this District; a substantial part of the events and omissions giving rise to the claims herein occurred in this District; and all Defendants are subject to the Court's personal jurisdiction.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

**THE PARTIES**

4.      Plaintiff Jan Brandrup ("Jan") is a citizen of Denmark and at all times relevant to this action has resided in Rancho Santa Fe, California, and has actively conducted business in this District pursuant to a L-1 visa.   L-1 visas are non-immigrant visas available to employees of international companies conducting business in both the United States and abroad.   Jan is the principal and sole shareholder of Brandrup AS, a Danish Corporation with its headquarters in Aalborg, Denmark.   Jan and Brandrup AS conduct business in this District through Brandrup AS's wholly owned subsidiary, Plaintiff Hyperikon, Inc., a California Corporation. Jan's L-1 visa provides for non-immigrant residence in the United States pursuant to his companies' U.S. business activities until November 2014, with an option to extend his residence for an additional 3 years thereafter.

5.      Plaintiff Nicklas Brandrup ("Nicklas"), Jan's son, also is a citizen of Denmark.   At all times relevant to this action, Nicklas has permanently resided in Copenhagen, Denmark.   For substantially the entire period of time between approximately March 15, 2013, and the date of this Complaint, Nicklas temporarily has been visiting this District pursuant to a tourist visa that expires on October 12, 2013.   Nicklas recently was approved to receive an Exchange Visitor Visa or "J-1 visa" which will enable him to remain in the United States for as long as 12 additional months for the purpose of gaining practical work experience in the United States with a "sponsor" company.   Nicklas's proposed sponsor company is Hyperikon, Inc.

6.      Plaintiff Hyperikon, Inc. ("Hyperikon"), is and was at all times relevant to this action a corporation organized under the laws of the State of California with its principal place of business located at 3444 Tripp Court, Suite C, San Diego, California and is and was at all times relevant to this action authorized to conduct,

and was in fact conducting, business in California.  Hyperikon is wholly owned by Brandrup AS, a Danish Corporation.  Jan owns 100% of the issued and outstanding stock of Brandrup AS, and thereby indirectly owns and controls Hyperikon.  Jan also acts as President and Chief Executive Officer of Hyperikon.  Hyperikon is in the business of designing, supplying and installing high technology lighting equipment, consisting almost entirely of "Light Emitting Diode" or "LED" equipment, for consumers in the US, Denmark, India, Russia, Turkey and other countries worldwide.

7.     Defendant Fernando Trujillo Grumbionin a/k/a "Grumbianin" a/k/a "Grumbianini" (for purposes of this Complaint he shall be referred to as "Trujillo") is a Mexican National permanently residing in California in Chula Vista, California.  Plaintiff is informed and believes Trujillo's true last name is Grumbionin but he uses various aliases to avoid potential creditors.   More specifically, Trujillo was a defendant in a recent San Diego Superior Court action that resulted in a substantial judgment against him individually.   The docket sheet from this prior State Court action indicates Trujillo originally was named as a defendant under the assumed name "Grumbianini," but after judgment was entered the plaintiffs discovered his true last name is "Grumbionin" and they modified the judgment accordingly.   At all relevant times in this Federal Court action, Trujillo represented to Plaintiffs that his last name was "Grumbianin," a representation that, based upon the docket sheet in his prior State Court action, appears to have been false. Upon information and belief, Trujillo was and is the controlling, beneficial owner of approximately 50% of the issued and outstanding shares of Defendant Platinum LED US, Inc., a California Corporation.  At all times relevant to this action, Trujillo acted and held himself out as an officer of Defendant Platinum LED US, Inc., with the titles of Vice President and Commercial Sales Manager.

8.     Defendant Alvin Gomez ("Gomez") is an individual residing in Del Mar, California.  Gomez is a member of the California State Bar and actively practices law

COMPLAINT

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

in this State in this District as Gomez Law Group, P.C., with offices located at 853 Camino Del Mar, Suite 100, Del Mar, California.  At all times relevant to this action, Gomez owned and controlled the other 50% of the issued and outstanding shares of Defendant Platinum LED US, Inc., and he acted and continues to act as President, Treasurer, Secretary, Chairman of the Board of Directors, and counsel for Defendant Platinum LED US, Inc.

9.     Defendant Robert Kenyon is an individual residing in San Diego County, California.  Mr. Kenyon is and at all times relevant to this action was the employee and Chief Operating Officer of Hyperikon.  Mr. Kenyon was not involved in any of the wrongful conduct alleged against the other Defendants named herein. Rather, as alleged in greater detail below, in reliance on the fraudulent misrepresentations and other wrongful conduct of Defendants Trujillo and Gomez, Hyperikon was induced to loan Mr. Kenyon approximately $100,000 for the sole and express purpose of enabling Mr. Kenyon to purchase shares of Platinum LED US, Inc., stock in connection with the Defendants' fraudulent, unregistered, non-exempt offering of these securities (the "Kenyon Loan").   Mr. Kenyon is named as a Defendant in this action for the sole purpose of adjudicating Plaintiffs' right to recover the $100,000 in Kenyon Loan funds Mr. Kenyon invested in connection with the fraudulent, unregistered, non-exempt securities offering at issue in this action. Otherwise, if, as, and when necessary and proper, Plaintiffs may seek to amend this Complaint to name Mr. Kenyon a voluntary or involuntary Plaintiff for the foregoing purposes.

10.     Defendant Platinum LED US, Inc. ("Platinum"), is a California Corporation with its principal places of business located at 2658 Del Mar Heights Road #215, Del Mar, California, and also at the office of Gomez Law Group in Del Mar, California. At all times relevant to this action, Defendants Trujillo, Gomez and Platinum (hereinafter collectively referred to as the "Platinum Defendants") publicly

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

represented that Platinum maintained "brick and mortar" offices located in Del Mar at 2658 Del Mar Heights Road #215, Del Mar, California.  On the contrary, however, Platinum's "brick and mortar" office location is not, in fact, an office suite, but rather a "mailbox" assigned the number "215" maintained by and within a Postal Annex store in the Vons Shopping Center on Del Mar Heights Road.  Platinum also has publicly represented during the relevant time period that it maintained offices at the same address as Gomez Law Group's office.

11.   Defendant Platinum was formed and organized under the laws of the State of California in September 5, 2012 and, at all relevant times, is and has been principally owned and controlled by Trujillo and Gomez.  At all times relevant to this action, Platinum held itself out as the primary worldwide distributor of LED lighting for commercial and residential purposes manufactured under the brand name "Energetic Lighting."  Energetic Lighting is the trade name and fictitious business name of a California Corporation, Yankon Industries, Inc. dba Energetic Lighting ("Energetic").  Upon information and belief, Energetic is a division of Zhejiang Yankon Group Co., Ltd., a Chinese Corporation whose stock is publicly traded on the Shanghai stock exchange.  Energetic's principal place of business is located at 13445 12th Street, Chino, California.

12.   Plaintiffs are informed and believe, and allege thereon, that each of the Platinum Defendants were at all times relevant hereto controlling persons, agents, and/or alter egos of the other Platinum Defendants, and in doing the acts as herein alleged, were acting within the course and scope of his or its authority as such with the expressed and implied permission, instruction, knowledge, consent, and ratification of the other Platinum Defendants.  Each of these Platinum Defendants did influence and govern the other Platinum Defendants with such a degree of unity of interest and ownership so that the individuality, and/or separateness, of each of the Platinum Defendants have ceased to exist.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

13.   The true names and capacities, whether individual, corporate, associate or otherwise of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiffs at this time, who therefore sue DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained; DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment.  Plaintiffs are informed and believe and thereupon allege that each of DOES 1 through 10 is legally responsible in some manner for the events and happenings referred to herein, and directly and proximately caused the damages and injuries to Plaintiffs as hereinafter alleged.

## SUMMARY OF THE CASE

14.   This case arises out of an unregistered, non-exempt offering of Platinum securities to Plaintiffs and their employee, Defendant Kenyon (the "Offerees").  More specifically, between April 2013 and July 2013, Defendants Trujillo and Gomez (the "Offerors"), who each held 250,000 shares of Platinum during this time period, offered to sell 120,000 of their shares to Offerees with a "value" of $7,200,000.00 (the "Offering").  The Offering contemplated that each of the two Offerors with the express permission and ratification of Platinum as the issuer, would sell 60,000 of their respective Platinum shares to the Offerees, such that if all 120,000 shares were purchased and sold, Trujillo and Gomez each would hold 190,000 shares, Jan would hold 70,000 shares, and Nicklas and Kenyon each would hold 25,000 shares.

15.   In connection with the Offering, Trujillo and Gomez represented that Platinum had a total equity value of $30,000,000.00, or $60 per share.  Trujillo and Gomez claimed they could "sweeten" the deal, however, and invited Plaintiffs to participate in the Offering in accordance with the following very general terms:  (1) in exchange for payments of approximately $1.4 million in up-front cash and other

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

consideration, Defendants would sell Plaintiffs an initial tranche of 40,332 shares (or $34.71 per share), to be allocated 26,200 shares to Jan, and 7,066 shares each to Nicklas and Mr. Kenyon; and (2) in exchange for future payments of $4,780,080.00 in cash (which could be paid at any time before March 31, 2014 for Jan's shares and anytime before March 31, 2015 for Nicklas's and Kenyon's shares), Plaintiffs and Kenyon could purchase the 79,668 balance of the total 120,000 shares offered in the Offering (or $60 per share) to be allocated 43,800 additional shares to Jan, and 17,934 additional shares *each* to Nicklas and Kenyon.

16.     The Offerees Nicklas and Kenyon are not accredited investors as that term is defined in Regulation D of the Securities and Exchange Act of 1934 and the Code of Federal Regulations promulgated thereunder.   All Offerees, including Plaintiffs Jan and Nicklas and Defendant Kenyon, are unsophisticated and lack the knowledge and experience in financial and business matters necessary to adequately evaluate the merits and risks of the prospective investments in Platinum that were the subject of the Offering.   Moreover, Plaintiffs Jan and Nicklas have a limited understanding of the English language, and utterly lack any experience with or reasonable understanding of U.S. business laws, customs and practices, and therefore these Plaintiffs were particularly susceptible to the Defendants' fraudulent business practices and other wrongful misconduct which occurred, as alleged in further detail below, in connection with Defendants' unregistered, non-exempt Offering.

## FACTUAL ALLEGATIONS

***The Platinum Defendants Offered And Sold Securities To Unaccredited Investors Who Lacked Sophistication In Financial And Business Matters***

17.     Jan attended Fredericia Technical Institute and received a M.A. in mechanical and electrical engineering in 1982.   From approximately 1982 to 1989, Jan worked for several engineering firms performing energy enhancement work for clients in Denmark and Greenland.   From approximately 1990 to 2010, Jan formed

and actively operated a Danish computer technology company called Epoka which focused on purchasing and selling used computers and computer components. During his time with Epoka, Jan promoted the company's expansion into Russia, India, Turkey and other countries.   In December 2010, Jan founded CO2light, a Danish company involved in designing, supplying and installing low energy "Light Emitting Diode" or "LED" business solutions for commercial and residential customers.

18.   Approximately one year later, in 2011, Jan moved to the United States where he formed Hyperikon to resume his LED business activities.   Jan's primary objective with Hyperikon was to utilize his existing international contacts, especially his contacts in Denmark, Russia, India, and Turkey to expand his growing LED business globally.   Hyperikon, like CO2light, focused almost exclusively on designing, supplying and installing LED equipment for its customers.   Since relocating to the United States with his wife, daughter and youngest son in 2011, and forming Hyperikon, Jan actively has been seeking a Green Card to establish permanent residence in the United States.   Otherwise, Jan's current L-1 visa provides for non-immigrant residence in the United States until, at the latest, November 2017.

19.   Jan worked for years in Denmark as an engineer, and also formed and operated his own used computer equipment sales company and a lighting equipment sales company.   He has absolutely no financial sophistication in matters relating to private U.S. domestic stock offerings.   He has only a rudimentary understanding of the English language, sufficient to conduct business abroad in places like Russia, India, Turkey and Germany, but he speaks, reads, and writes English with extremely limited proficiency.   Jan has no prior experience whatsoever evaluating the risks of securities investments in the United States.   Because Jan lacked financial sophistication in matters of United States securities investments, as described above,

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

he lacked a reasonable understanding of the Platinum Offering documents at issue in this case.

20.    In 2012, Jan's eldest son Nicklas graduated from Copenhagen Business School where he studied international business and economics.  More specifically, Nicklas focused his studies on European supply chain management and organizational behavior.  In or around late 2012, Nicklas left Denmark to visit his father in the United States.  Nicklas also hoped to eventually obtain the necessary visas and a position of employment in the United States so he could be closer to his parents.  Nicklas is 22 years old and has no prior practical experience whatsoever evaluating the risks of a securities investment, particularly a private offering of securities in the United States.  Nor were United States securities investments a topic of any of his undergraduate studies at the Copenhagen Business School, which focused on European macro-economic topics.

21.    Moreover, while Nicklas's proficiency in English is slightly better than his father's, he also has only a rudimentary understanding of the English language as used in business affairs.  Like his father, he speaks with a heavy Danish accent and is far from fluent as an English speaker, reader and writer.  Because Nicklas lacked financial sophistication in matters of United States securities investments, as described above, he lacked a reasonable understanding of the Platinum Offering documents at issue in this case.

22.    Kenyon served in the military during the Vietnam conflict.  When he returned from military service, he attended and graduated from the University of Arizona College of Law.  Upon information and belief, Kenyon only briefly practiced law, working as an Assistant District Attorney in San Diego during the 1970s.  Since that time period, however, Kenyon generally has remained an inactive member of the Bar and has not practiced law for a living.  For the majority of Kenyon's career, from approximately 1985 to 2007, Kenyon operated a travel agency.  Then, in March 2009,

Kenyon obtained a real estate broker's license issued by the California Department of Real Estate.  Upon information and belief, Kenyon was unable to broker any real estate transactions from 2009 until 2011.  Jan met Kenyon in 2011 when Jan was seeking to purchase a home in San Diego in connection with his move to the United States from Denmark.  Jan hired Kenyon as his real estate broker and Kenyon brokered Jan's purchase and sale of his home in Rancho Santa Fe, Kenyon's first and only real estate brokerage transaction.

23.    In or around May 2011, after discussing Kenyon's struggles in the real estate industry, Jan proposed that Kenyon work for Jan's new company, Hyperikon, and Kenyon accepted a position as Hyperikon's Chief Operating Officer ("COO"). At all times relevant to this Complaint, Hyperikon employed Kenyon as it COO.  Jan trained Kenyon in the LED lighting business and Kenyon now installs various lighting projects unsupervised.  Jan, however, as the CEO of the company, exclusively meets with customers, evaluates and makes recommendations regarding customers' prospective lighting needs, prepares formal design proposals and budgets and supervises Hyperikon's various LED lighting installation projects.

24.    Kenyon practiced criminal law on a junior level for a short period 40 years ago, he operated a travel agency for most of his career, and he worked as a real estate broker for approximately 3 years in which he did not actually sell any real estate.  Kenyon has had no practical experience whatsoever with private offerings or any other related business matters requiring financial sophistication.  Because Kenyon lacked financial sophistication, as described above, he lacked a reasonable understanding of the Platinum Offering documents at issue in this case.

***The Platinum Defendants Make Fraudulent Statements In Connection With The Offering And Sale Of Platinum Securities To Plaintiffs***

25.    On or about March 24, 2013, during a discussion with an acquaintance at their young sons' soccer game, the acquaintance mentioned to Jan that he knew

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

someone who owned 12 hotels in the San Diego area.  He offered to introduce the hotel owner to Jan and Hyperikon to discuss the hotels' prospective LED lighting needs, if any.  The next day, however, Jan learned the hotel owner already had recently purchased LED lighting for his 12 hotels in the San Diego area from Energetic, a Chinese firm based in Chino California.

26.     Jan obtained the contact information for Energetic to generally inquire about the company and perhaps discuss a prospective distributorship relationship. Jan knew very little about Energetic but he believed Energetic recently entered into contracts to service 12 hotels in the San Diego area, which Jan considered an impressive deal.    On March 25, 2013, Jan called Energetic's office number and Defendant Trujillo answered and introduced himself as the Commercial Sales Manager of "Energetic Lighting."  Jan inquired about the company generally and the possibility of distributing its LED products.  Trujillo stated, "We are the largest LED lighting manufacturer in the world. We sell several billion dollars' worth of commercial and residential LED lighting equipment annually."  Trujillo then invited Jan to attend a meeting at his offices in Del Mar that same day to further discuss prospective distributorship arrangements.  Jan expressed surprise that Trujillo was not working out of a large, distant warehouse, and Trujillo explained that although he maintained a very large warehousing facility in Chino, California, he also maintained offices in Del Mar very close to Hyperikon's offices in Sorrento Valley.

27.     Shortly after the phone call, Jan drove the short distance to the office address in Del Mar provided by Trujillo to meet with Trujillo in person and further discuss a prospective distributorship arrangement with Energetic.  When Jan arrived at the location, he realized Trujillo provided him the address for Gomez Law Group. Jan entered Gomez Law Group's office and Gomez and Trujillo both were present for the planned meeting.  Gomez introduced himself as Trujillo's "business partner" and "counsel," giving Jan the initial impression Gomez was acting as counsel for

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

Energetic.  At this time, Jan's understanding was that Energetic maintained its headquarters in Chino, California, and Energetic's Commercial Sales Manager, Trujillo, periodically held meetings at the office of Energetic's counsel for convenience, since Trujillo lived in Chula Vista, California, and also to address any potential legal issues that may arise in such meetings.  After the attendees' initial introductions, Jan displayed Hyperikon's proprietary marketing material, research studies commissioned from UCLA regarding the health effects of fluorescent lighting, and numerous other sales and promotional materials and templates, and he explained to Trujillo and Gomez Hyperikon's business model in great detail, which he stated repeatedly was focused almost exclusively on LED products and related services.  Jan emphasized how the expensive study he commissioned from UCLA was a strong selling point for Hyperikon's LED-based business model.

28.     After Jan's presentation, which lasted approximately one hour, the parties concluded this initial March 25 meeting.  Trujillo and Gomez requested that Jan return the next day for another meeting.

29.     On or about March 26, Jan returned to Gomez Law Group's office for a second meeting.  Gomez and Trujillo both were present.  During this second meeting, the Platinum Defendants merely further explored Jan's business model and technical capabilities.  The meeting concluded quickly and the parties arranged to meet again the next day.

30.     On or about March 27, Jan returned to Gomez Law Group's office for a third meeting.  Gomez and Trujillo both were present.  Trujillo stated that although Hyperikon was an appealing distributor, and Energetic was now manufacturing and selling "billions of dollars" of LED products worldwide, a direct distribution agreement between Energetic and Hyperikon was "not available" because Energetic actively had been terminating and reducing its distributorship relationships to focus solely on the most effective distributors.  According to Trujillo, Energetic now

distributed exclusively through 1000 Bulbs Unlimited and the wholly owned corporation of Trujillo and Gomez called Platinum LED US, Inc.   This was the very first time Jan recalls hearing about the entity Platinum, and he was disappointed to learn, after three separate meetings regarding a distributorship, that Hyperikon could not become a direct distributor of Energetic products.

31.   Thereafter, instead of discussing a prospective arrangement between Hyperikon and Energetic, as Jan had contemplated based on his previous discussions and meetings with Trujillo and Gomez, Gomez and Trujillo immediately launched into a hard-sell presentation describing the many accomplishments and assets held by their wholly owned company Platinum.  Gomez and Trujillo initially delivered their hard-sell presentation to Jan individually during the March 27 meeting, and then again in a meeting with Jan and Nicklas on March 28, also held at Gomez Law Group's office in Del Mar

32.   Gomez and Trujillo both stated to Jan and Nicklas during these meetings that Platinum enjoyed a lucrative long-term exclusive distributorship relationship with Energetic (a/k/a Yankon Industries, Inc.) and its parent company in China, Zhejiang Yankon Group, Co., a publicly traded company listed on the Shanghai stock exchange.  Trujillo stated, and Gomez affirmed, Platinum's exclusive distributorship agreement had an initial 5-year term with two separate options to renew for 5 additional years per option. They claimed Energetic manufactured the lighting equipment sold under the brand names Philips, Osram and Sylvania, but that the equipment sold under its own brand name Energetic was the highest quality.  They also both represented to Jan during this meeting that as a result of the extremely favorable pricing on Energetic products, which never exceeded "Energetic's cost plus 15%," Platinum had successfully secured extremely lucrative "executed contracts" as well as numerous prospective contracts, which Fernando repeatedly referred to as

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

"informally closed" and "done deals," with large commercial customers mostly located in the United State and Mexico.

33.   For example, Trujillo represented orally and in writing, and Gomez affirmed, that Platinum recently received an "executed order" for over $10 million worth of Energetic products from Southern California Public Power Authority ("SCPPA").

34.   Trujillo and Gomez also represented that Platinum's Exclusive Distributorship Agreement with Energetic spanned the globe, and that new markets could readily be added to the existing agreement.   Jan inquired about Platinum's arrangements, if any, for sales in Jan's home country of Denmark, or in Russia, Turkey or India, where Jan had numerous business contacts from his work with Epoka.  Trujillo and Gomez unequivocally confirmed Platinum enjoyed exclusivity in Jan's prized countries of Denmark, Russia, and India, along with Mexico, Central America, South America, Dominican Republic, United Arab Emirates and South Africa (the "Territory").   Trujillo claimed Platinum was actively seeking exclusivity in Turkey as well.   Trujillo and Gomez stated the businesses of Platinum and Energetic were so intertwined that consumers frequently considered them to be one and the same company, in much the same way Jan initially confused Platinum with Energetic.

35.   Trujillo and Gomez were adamant during these meetings that the only way Jan could legally distribute products for Energetic was if Jan became a shareholder of Platinum.   But if Jan became an "owner" of Platinum, according to Trujillo and Gomez, he would enjoy unlimited access to Energetic's "cost plus 15%" pricing on all Energetic products and exclusive distribution rights internationally. Trujillo and Gomez repeatedly and excitedly emphasized the "astronomical value" of Platinum's distribution rights.   Trujillo claimed, and Gomez confirmed, that on two separate occasions within the past few months, two separate prospective purchasers in

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

Mexico each offered to acquire Platinum's exclusive rights to distribute Energetic products in Mexico alone for $6 million.  Platinum turned down both $6 million offers outright, according to Trujillo and Gomez, and did not bother making a counter-offer because Platinum's exclusivity rights in Mexico were worth many millions of dollars and they viewed the $6 million offers for Platinum's rights in Mexico as insultingly low.

36.     On the few occasions when Jan expressed the slightest skepticism during these initial meetings, Gomez exclaimed that he was one of the most highly respected business attorneys in San Diego, with 25 years of distinguished service and unimpeachable ethics.  At the conclusion of the parties' fourth meeting on March 28, 2013, the Platinum Defendants invited Jan and Nicklas to attend a fifth meeting on March 29, 2013, at which the Platinum Defendants would share information concerning Platinum's business model, products, transfer pricing, and lucrative contractual arrangements.

37.     Jan, Nicklas, Gomez and Trujillo attended a fifth meeting in person on March 29, 2013, at Gomez Law Group's office.  Trujillo and Gomez circulated a written price list and a catalog of products available to Platinum at the steeply discounted "cost plus 15%" pricings.  The list circulated to Jan and Nicklas during this meeting was comprehensive and highly appealing to any reasonable business person in the LED lighting business.  Shortly after circulating Platinum's purported products catalog and price list, Trujillo insisted Jan and Nicklas return the catalog and price list to Gomez due to the "highly sensitive" nature of these documents.

38.     During the March 29, 2013, meeting, Trujillo and Gomez also distributed copies of a document they claimed contained details regarding the "extremely lucrative" deals Platinum purportedly had in its "Pipeline" (the "Pipeline Deals") as a result of its access to the extensive product lines and steeply discounted pricing reflected in the catalogs and price lists he had shared with Jan and Nicklas

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

earlier. Among other glowing representations regarding the actual and prospective contractual relationships between Platinum and its purportedly large-scale commercial and municipal customers, the Pipeline Deals included the following specific representations regarding Platinum's business opportunities:

a. Southern California Public Power Authority: Defendants claimed the Southern California Public Power Authority (the "SCPPA") signed an agreement with Platinum whereby Platinum would begin to supply 12 municipal utilities in California, including Anaheim Public Utilities. Defendants also represented they recently received a "phone order" from the SCPPA placing one order for Compact Fluorescent Lamps "CFL" valued at $685,000.00 and a separate order for residential LED installations valued at $10,600,000.00, which Platinum expected to receive "in the next days." To emphasize the absolute "certainty" of the SCPPA deal as presented in the Pipeline Deals, Trujillo briefly left the meeting room and returned with a copy of the purported "signature page" of the SCPPA contract, which appeared to be an enlarged cell phone photograph of two signatures on one page, one of which was a signature of an Energetic representative and the other a signature of a SCPPA representative, without terms or conditions or any other information whatsoever regarding the SCPPA deal;

b. Coppel: Defendants claimed a Mexican entity named Coppel committed to place a "first order of 50,000 pieces from a total of at least 3,000,000 pieces for the next 36 months." Defendants represented this would result in gross revenue to Platinum of $120,000,000.00;

c. Santa Fe Stand: Defendants claimed a chain of 95 supermarket stores owned by a close friend of Trujillo intended to retain Platinum for a project valued at $9,000,000.00, a deal which Defendants represented, in writing, had a "90% possibility" of closing in the immediate future.

d.      Sheraton Los Cabos:  Defendants represented this hotel "already sent us the first order yesterday" for a three phase project worth $400,000.00.

e.      Soriana:    Defendants represented this major Mexican retail conglomerate "wants to replace the parking lot lighting at all stores" in the next 36 months *through Platinum*, a deal purportedly worth $48,000,000.00.

f.      Among numerous other similar affirmative statements regarding actual and imminent business opportunities established by Platinum as of March 29, 2013.

39.    In an effort to impress the meeting attendees, Gomez displayed one of Energetic's Dolphin street lights with pride.  Jan asked if the street lights were properly certified, and Gomez claimed the light was UL approved but not Energy Star approved.[1]  Gomez represented, however, that the Dolphin street lights would be Energy Star certified within a few short weeks, a reasonable and anticipated delay, according to Gomez, since the Dolphin street lights were "prototypes" not yet actively marketed by Platinum.  Trujillo then represented that Energetic supplied the highest quality LED and other lighting products to Platinum with all the necessary certifications in place to sell these products to any consumers within Platinum's exclusive Territory.

---

[1] Prior to sale, all lighting products must be certified by various government regulated entities, which vary from country to country, to ensure the lighting products sold to consumers maintain certain minimum energy efficiency, fire and electrocution safety standards.  For example, in the United States, lighting products must maintain, at a minimum, a "UL" or "ETL" certification for safety purposes, whereas in Mexico, lighting products must maintain a "NOM" certification for safety purposes.  For energy efficiency purposes, lighting products in the United States must maintain an "Energy Star" certification to qualify for government subsidized rebate and incentive programs, and in Mexico, an "FIDE" certification entitles consumers to similar rebates and incentives.  Other countries worldwide maintain their own similar but unique certifications.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

40.     Jan also inquired about Platinum's ability to process SDG&E rebates for customers, an essential part of Hyperikon's LED and lighting energy efficiency business.   Hyperikon implemented a complex computerized system to track and process energy savings rebates for its customers so this was an important consideration for Jan.  At that point, Gomez very adamantly stated that Platinum was extremely well integrated in the SDG&E rebate and incentive program, with a "team" in place processing and tracking the various phases of SDG&E's rebates and other incentives for its customers.   Gomez claimed he had numerous contacts and acquaintances at SDG&E, who helped Platinum efficiently process rebates and pass along the substantial savings to its many customers.

41.     After reviewing the Pipeline Deals with the attendees at the meeting in detail, Defendant Trujillo utilized a "white board" to demonstrate how the group should properly value and offer 10% of the issues and outstanding Platinum stock to Plaintiffs.  Trujillo explained that utilizing customary business valuation methods, Platinum was worth $30,000,000.00, based on the "current contracts" and prospective contracts identified in the Pipeline Deal Terms, the prior "substantial" monetary investments of Trujillo and Gomez, and the Exclusivity Agreement with Energetic. After writing the $30 million number on the board, Trujillo proceeded to explain that given this valuation, Platinum's 500,000 shares of issued and outstanding common stock were worth at least $60 per share.  A 10% share of Platinum, therefore, would cost $3,000,000.  Both Trujillo and Gomez represented to Jan and Nicklas that this share price was based upon a substantial undervaluation of the company.

42.     During this March 29, 2013, meeting and white board presentation, Gomez agreed with Trujillo's calculations and Trujillo and Gomez further represented that Gomez would act as the attorney for all interested parties to ensure the safe and lawful transfer of stock from the current stockholders, Trujillo and Gomez, to Plaintiffs.  Gomez repeatedly represented that he would never jeopardize

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

his sterling reputation as an upstanding San Diego attorney by engaging in any misconduct or otherwise mishandling the Offering in any way.

43.   At the conclusion of the March 29, 2013, meeting, Trujillo and Gomez suggested that Jan purchase the 10% interest with $1,000,000 in cash up front, and $2,000,000 payable from the substantial commissions he would be earning as a new Platinum representative with access to Energetic exclusivity and pricing.  Defendants claimed Jan, as a new Platinum stockholder, would also be earning "substantial seven figure dividends and distributions" from the contracts described in the Pipeline Deals alone.  Trujillo finished his presentation by saying, "Look, we need you and all your marketing materials and expertise, but you have to invest to sell Energetic.  Maybe I am crazy for letting you invest on these terms so you should take this deal before we change our minds."

44.   Plaintiffs finally left the meeting, advising Trujillo and Gomez they all needed some time to think about the offer.  The very next day, however, on March 30, 2013, Trujillo sent an email to Gomez, copied to Jan and Nicklas, affirmatively stating, in relevant part, "we have the agreement / Contract with SCCPA, and on that particular 12 Utilities they are accepting all LED T8's, with our brand…"   In this email, Trujillo obviously attempted to further assure Jan and Nicklas that Platinum's "lucrative" $10.6 million deal with SCCPA was proceeding and that all Energetic's LED products were certified, Energy Star approved for rebates, and ready for delivery.

45.   On April 3, 2013, Jan and Nicklas called Gomez via Jan's Bluetooth speakerphone in Jan's car during their morning commute to Hyperikon's offices.  Gomez did not answer so Jan left a voice message stating Jan could not afford to pay $1 million for Platinum shares and did not wish to participate in the Platinum Defendants' securities offering.  Gomez immediately returned the call approximately 5 minutes later from Gomez Law Group's phone and stated, "Jan, I just listened to

your voice message and you sounded so sad.  Please come to my office right now and I will try my best to work something out.  I really do not want you to miss out on this great opportunity and will do whatever I can to help you."

46.    Jan and Nicklas then drove straight to Gomez Law Group's office as Gomez requested where Gomez and Trujillo were waiting for them.  Upon their arrival, Jan confided, "Guys, I cannot make this investment.  I am not that that loaded." Gomez responded in a sarcastic tone, "Oh, come on Jan!"  Trujillo then exclaimed, "Jan, we asked you to come today because we have great news!  I somehow convinced Gomez to let you in for only $100,000 up-front."  Gomez then confirmed he made arrangements, with considerable effort, to permit Jan to purchase the same 10% of Platinum's issued and outstanding stock for an up-front payment of only $100,000.00.  In exchange for $100,000.00, Jan would receive 1,666 shares ($60 per share).  Jan would be expected to purchase the remaining 48,334 shares before the end of 2013.  Trujillo assured Jan his substantial "seven-figure" income as an Energetic distributor and Platinum shareholder would be more than adequate to purchase the remaining shares.  According to Gomez, however, Jan had to purchase the minimum 1,666 shares immediately or Platinum legally would be forced to exclude him from the Pipeline Deals.

47.    During the April 3, 2013, meeting, Gomez and Trujillo concocted a scheme to convince Jan that his 22-year-old son Nicklas also would benefit from Jan's substantial prospective $100,000.00 initial investment in Platinum.  Nicklas previously discussed with Gomez and Trujillo his goal of creating a web application compatible with smart phones to enable consumers to test or "audit" the lighting in their residential environments.  Nicklas told the men he considered naming this prospective application "LEDHomekit."    Solely to further entice Jan to invest $100,000.00 at the April 3, 2013, meeting, Trujillo and Gomez offered to sell Nicklas 1,666 shares of Platinum stock in exchange for all "intellectual property" developed

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

by Nicklas in connection with LEDHomekit.  The Platinum Defendants conveniently valued Nicklas's "intellectual property" at $100,000.00, the same price Jan would be paying for his initial tranche of 1,666 shares.  Upon information and belief, the sole purpose of this bogus transaction was to convince Jan that his initial investment in Platinum, and any subsequent prospective investments, also would benefit his son as a Platinum shareholder in this "deal of a lifetime."

48.   The "intellectual property" transferred to Platinum by Nicklas for these shares, however, was nothing more than a vague idea, undeveloped, untested, and unprotected by any U.S. or international intellectual property laws.  Upon information and belief, the Platinum Defendants absolutely knew, or reasonably should have known, that Nicklas's "$100,000.00 LEDHomekit idea" had very little if any real value.  Based on all of the circumstances alleged herein, the Platinum Defendants included Nicklas in the Offering on these terms with the sole intent and purpose of enticing Jan to invest $100,000.00 in cash in Platinum, along with additional subsequent cash investments in Platinum, all for the benefit of Gomez and Trujillo.

49.   Jan asked the Platinum Defendants if he should hire an attorney to advise him regarding this new proposal.  Gomez, however, expressly assured Jan that Gomez was acting as Jan's attorney and would protect Jan's interests as well as the interests of all Platinum's investors.  In so advising and assuring Jan, Gomez violated the California State Bar Rules of Professional Conduct, Rule 3-310, prohibiting the representation of clients with adverse interests and irreconcilable conflicts of interest, particularly without the *informed* written consent of Jan.  Reacting to the sense of urgency and pressure Gomez communicated to Jan and Nicklas, Jan agreed to immediately make arrangements to wire Gomez $100,000.00.  He also agreed to return to Gomez Law Group's office as soon as possible to sign any documentation Gomez prepared and recommended, as Jan's attorney, to memorialize the parties' agreement.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

COMPLAINT

50.     Under extreme pressure imposed by Gomez, who threatened to exclude Jan from the Pipeline Deals for "legal reasons" unless he invested $100,000.00 immediately, and in reliance on all of the foregoing representations made by the Platinum Defendants, Jan and Nicklas returned to the Gomez Law Group's office on or around April 5, 2013.  Upon information and belief, Gomez presented Jan with documents purporting to memorialize the parties' agreement to transfer 1,666 shares to Jan in exchange for $100,000.00, and to transfer 48,334 shares to Jan before the end of 2013 in exchange for $2.9 million in commission payments and/or other consideration.  At this same meeting, Gomez also presented Nicklas with an agreement, prepared by Gomez, purporting to transfer "the rights to LEDHomekit" to the Platinum Defendants in exchange for 1,666 shares of Platinum stock.  Jan and his son signed the documents Gomez presented to them, despite the fact neither could understand the complex legal terminology in any of the documents, which were written in English only, as Gomez had expressly assured Plaintiffs he was protecting their interests in Platinum as their attorney and fiduciary.

51.     On April 8, 2013, (the Monday following the parties' Friday April 5, 2013, meeting, described above), Jan wired Gomez $100,000.00.  Upon information and belief, the wiring instructions prepared by Gomez caused Jan to wire this $100,000.00 payment to a checking account controlled solely by Gomez.

52.     Throughout the remainder of April, Jan repeatedly requested that Gomez provide him copies of the necessary documentation concerning his substantial $100,000.00 investment, and also provide further direction regarding how to integrate the businesses of Hyperikon and Platinum such that Hyperikon could begin marketing and selling Energetic products in the Territory, properly quote prices to consumers based on transfer cost pricing between Energetic and Platinum, and process and administer rebates.  Instead of providing the requested documents and information, however, Gomez became very angry and heated during several meetings

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

and telephone discussions in April.  He represented on numerous occasions during April, as he had during the meetings before, that he was a prominent, well recognized "business attorney" in San Diego and he represented Jan's interests as well as Platinum's interests, which Gomez inexplicably claimed were aligned.

53.     In or around mid-April, Trujillo approached Jan by telephone and in person and suggested that perhaps he could arrange for Jan's COO, Robert Kenyon, to become a shareholder of Platinum on the same extremely favorable terms the Platinum Defendants had offered to Jan, as a gesture of good faith to Jan and his team.  Subsequently, during a late April meeting at the Gomez Law Group's office, the Platinum Defendants engaged in the first of many egregious and tragic "good cop, bad cop" artifices to further defraud Plaintiffs in connection with the Platinum Offering.  First, Fernando presented his bogus rationale for including Kenyon in Platinum's Offering as a gesture of good faith and to motivate Platinum's new "team."  Then Gomez, on cue, acted highly agitated and protested heatedly against the plan which he claimed was "extremely unfair" to the company and its founders, Gomez and Trujillo.  After additional mock convincing by Trujillo, however, Gomez "relented" and agreed to "let Robert in."  Jan, completely fooled by the Platinum Defendants' charade, expressed tremendous gratitude toward Gomez and Trujillo for this great "opportunity" and thanked both men graciously for "the honor" bestowed upon Hyperikon's team.  In reliance on the Platinum Defendants misrepresentations and artifice to defraud Jan, Jan agreed to facilitate Kenyon's investment in Platinum via a loan from Hyperikon, as Kenyon had no liquid assets of his own to invest.

54.     Incredibly, Gomez insisted on handling all aspects of this transaction on behalf of all parties, despite the obvious irreconcilable conflicts of interest and direct violations of California State Bar Ethical Rule 3-310 and California Business & Professions Code § 6068, et seq.  Gomez prepared and circulated a promissory note by Kenyon in favor of Hyperikon in the principal amount of $100,000.00, and then

instructed Jan to cause Hyperikon to transfer the $100,000.00 Kenyon Loan amount directly to Gomez's account. On May 6, 2013, in reasonable reliance on all of the foregoing representations, Jan caused Hyperikon to wire transfer this second $100,000.00 payment to an account controlled by Gomez pursuant to the express instructions of Gomez who Jan believed was acting as his attorney.

55.     Then, in or around the middle of May 2013, in furtherance of the Platinum Defendants' ongoing scheme to defraud Plaintiffs, Trujillo and Gomez called a meeting with Jan, Kenyon and Nicklas at Gomez Law Group's office. Gomez commenced the meeting by proclaiming to be an expert in trusts and corporations. Gomez offered to incorporate a U.S. domestic corporation for Jan, also at no charge, for the sole purpose of holding Jan's Platinum shares and receiving the substantial dividends he could expect in the near future as a Platinum shareholder. Gomez also offered to prepare a U.S. trust for Jan and his family, at no charge, so long as Jan simply provided Gomez a detailed schedule of his assets.

56.     At this same meeting, Trujillo, who holds a Green Card, claimed that Jan could easily obtain his Green Card if he structured his Platinum investment properly through the trust and corporate services recommended by Gomez. After listening to Trujillo's bogus claim that Jan could more easily obtain a Green Card by establishing a U.S. trust, Gomez offered to provide Jan the necessary trust, corporate and immigration services to apply for an expedited Green Card. Gomez claimed he would work in conjunction with an immigration attorney named Grace Zimmerman, who Plaintiffs understood was Gomez's friend and colleague.

57.     Jan relied on Gomez's representations that he was acting as Jan's attorney for all purposes in connection with the Platinum transaction, including these ancillary corporate, estate planning, and immigration matters. Jan and his wife met with Gomez to discuss a prospective trust in early July 2013. During this meeting, Gomez requested a detailed list of all assets held by the family and details regarding

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

the family's financial condition.   Jan became uncomfortable disclosing such private information to his new "business partner," but Gomez repeatedly assured Jan and his wife that Gomez was not just a business partner but also Jan's attorney protecting Jan's interests with the utmost fiduciary and ethical duties such a relationship entails. Jan and his wife, who had no experience dealing with U.S. attorneys, believed Gomez and presented him with a list of the family's assets.   On information and belief, the Platinum Defendants' sole intent and purpose of having Gomez offer Jan trust services was to determine if Jan had additional available cash to invest in Platinum. [2]

58.   On July 17, 2013, Gomez formed a California corporation on behalf of Jan called Takecare, Inc.   Upon information and belief, Jan and his wife are equal 50% shareholders of Takecare, Inc.   Gomez not only prepared and filed all of the necessary corporate paperwork on behalf of Takecare, Inc., but Gomez also assumed the role of registered agent for service of process, a role Gomez continues to serve for Jan's corporation today.

59.   At the same time Gomez initially was advising Jan concerning the foregoing trust and corporate services, Trujillo called Jan in or around late May 2013 to discuss the Platinum Offering.   During Trujillo's initial telephone call and during subsequent in person meetings at the Gomez Law Group's office in early June 2013, attended by Jan, Nicklas, Kenyon, Trujillo and Gomez, Trujillo advised Plaintiffs that the Platinum Defendants were prepared to offer them "extremely generous" additional stock Offering terms.

60.   According to Trujillo, whose statements were ratified and approved by Gomez who attended every meeting, Platinum greatly appreciated Hyperikon's skills, goodwill, marketing materials, the UCLA study, and other intellectual property. As a result, "after much convincing," Gomez had agreed to offer an even sweeter deal to

---

[2] The Gomez Law Group's website describes a law practice limited to personal injury, elder and dependent care abuse, and wage and hour employment litigation matters. See http://alvingomez.com/.

Plaintiffs to reflect Platinum's good faith and confidence in its new relationship with Platinum's "new business partners."  The Platinum Defendants then proceeded to offer Plaintiffs a substantially greater stake in the company in exchange for substantially all of the assets of Hyperikon and a promissory note executed by Jan in favor of Platinum.   According to Trujillo, these additional financial commitments, along with the Jan's previous $200,000.00 in cash payments, and Nicklas's previous transfer of the $100,000.00 "LEDHomekit," would substantially increase the Plaintiffs' initial stock holdings.  Trujillo promised Plaintiffs if they agreed to these new terms, they would enjoy greater financial participation in the coveted Pipeline Deals because they would receive considerably larger initial tranches of Platinum stock immediately, along with proportionately greater rights to dividends and distributions.

61.    As Trujillo presented the new "sweetened deal," in very general terms, Plaintiffs and Kenyon would receive approximately $2.4 million worth of Platinum stock in exchange for "only $1 million" in cash up-front, and approximately $400,000 in Hyperikon assets and "goodwill."  In addition, instead of 10% of the issued and outstanding shares of Platinum, Jan now would be entitled to a total of 14% of Platinum's issued and outstanding stock, after performing all terms of the Offering, and Nicklas and Kenyon each would be entitled to 5%.

62.    After several more discussions on the phone and in person, Gomez presented Jan and Nicklas new Offering documentation during a meeting at Gomez Law Group's office in early June 2013.  According to Gomez and Trujillo, Plaintiffs and Kenyon now would be entitled to an initial tranche of 40,332 shares in exchange for $1,375,035.71 (or $34.09 per share), to be allocated 26,200 shares to Jan, and 7,066 shares each to Nicklas and Mr. Kenyon.  The $1.375 million payment would be comprised of the following three separate items of consideration:  (1) the $200,000.00 Jan already paid to Gomez, including $100,000 paid on April 8, 2013, and $100,000

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

paid by Hyperikon for Kenyon's benefit on May 6, 2013; (2) a new promissory note executed by Jan in favor of Gomez and Trujillo in the amount of $402,650.00, payable in 7 monthly installments of $50,000 and one monthly installment of $52,650 (the "Jan Note"); and (3) a transfer of all tangible and intangible assets of Hyperikon, valued at $772,000, including its accounts receivable of $376,025.00, which was payable by Hyperikon's customers in monthly installments of $6,685.00. [3]

63.     Additionally, as part of this final "Offering," in exchange for future payments of $4,780,080.00 in cash (which could be paid at any time before March 31, 2014 for Jan's shares and anytime before March 31, 2015 for Nicklas's and Kenyon's shares), Plaintiffs and Kenyon could purchase the 79,668 balance of the total 120,000 shares offered in the Offering (or $60 per share) to be allocated 43,800 additional shares to Jan, and 17,934 additional shares each to Nicklas and Kenyon. Trujillo and Gomez both emphasized in emails, telephone calls and in person meetings in June 2013 that Plaintiffs and Kenyon would easily cover the $4.78 million balance owed to the Platinum Defendants by applying varying percentages of the "substantial commissions" Jan, Nicklas and Kenyon would be generating as Platinum agents over the next 9 to 21 months to stock purchases.  Plaintiffs indicated they would consider the new Offering terms and respond as soon as possible.

64.     Between June 15, 2013, and July 6, 2013, Jan and Nicklas returned to Denmark to vacation and visit friends and family.  During this time period, the Platinum Defendants engaged in additional, egregious high-pressure sales tactics and fraudulent, unethical misconduct intended to serve the following two purposes:

---

[3] Kenyon listed Hyperikon's inventory and other assets on a sheet of paper for review by Gomez and Gomez assigned a value of $772,000.00 to Hyperikon's assets transferred in connection with the new Offering terms.  Gomez arbitrarily assigned a value of $250,000 to Hyperikon's "goodwill," solely for the purposes of enticing Jan to invest more up-front cash in Platinum for the benefit of Gomez and Trujillo.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

(a) To extract as much cash as possible from Plaintiffs as quickly as possible; and

(b) To frighten Plaintiffs regarding purported exposure to potential criminal and civil liability in order to detract attention from Platinum Defendants' unlawful fraudulent misconduct.

65.    First, on June 12, 2013, immediately prior to Jan's departure to Denmark, Trujillo called Jan and stated in a very concerned tone that Gomez discovered Kenyon "broke the law."  According to Trujillo, again playing his "good cop" role in the Platinum Defendants' artifice to defraud Plaintiffs, Kenyon had somehow "misstated" the value of certain Hyperikon assets in the asset transfer documentation.  As a result of Kenyon's "misstatements," Trujillo explained, the Platinum Defendants could unilaterally take ownership of all shares of stock previously purchased by Plaintiffs and Kenyon.  Trujillo said Gomez had specifically included provisions in the parties' agreements which allowed him to take this extreme measure in the event of such "misstatements," and that Gomez likely would proceed unless Jan invested "another $25,000.00 in up-front cash" to "calm Gomez down" and to "show good faith."

66.    Trujillo promised the new proposed Offering terms would remain the same and the $25,000.00 payment would reduce the prospective Jan Note (with a principal balance due of $402,650.00) accordingly. Trujillo warned Jan, however, that this minimal additional $25,000 up-front cash payment was absolutely necessary for Trujillo to pacify Gomez.  Upon information and belief, these "warnings" were made at the express instruction of Gomez who Trujillo said was extremely angry and concerned about these "recent developments."  Concerned, and under duress imposed by Trujillo and Gomez whom Jan believed to be acting in Jan's best interest, Jan wired another $25,000.00 to Gomez two days later on June 14, 2013,  the day before he departed for Denmark.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

67.     Then in late June, Trujillo called Jan and Nicklas multiple times in Denmark and warned them that Gomez now was investigating the "true value" of LEDHomekit.  According to Trujillo, again playing "good cop," Gomez complained about the $100,000.00 LEDHomekit valuation, and also complained about Nicklas's contributions over the past few months to Platinum's internet sales strategies.  Gomez once again communicated through Trujillo his intention to unilaterally take ownership of all shares of stock previously purchased by Plaintiffs and Kenyon unless Jan agreed to the new Offering terms and invested more capital into Platinum.

68.     Finally, also in late June 2013, both Gomez and Trujillo called Jan and advised him there was a very serious problem concerning two of Hyperikon's commission based sales people.  Specifically, Gomez represented that Hyperikon's sales agreements with Augustine ("Gus") Gallo and Jeff Powell included "clearly fraudulent misrepresentations" which, in the United States, constituted criminal and civil offenses.  Gomez advised Jan that the only solution was for Platinum to assume these employees' commission based sales agreements so Gomez could restructure the agreements and thereby resolve any potential exposure to the company, or to Jan individually, for Jan's "fraud."  Jan readily accepted Gomez's proposal because he believed Gomez was acting as his U.S. attorney protecting Jan's interests with the utmost fiduciary duties of loyalty and fair dealing.

69.     Jan returned from Denmark on July 5, 2013, a Saturday, and he attended a meeting at Gomez Law Group's office the following Monday on July 8 to discuss the "developments" at Platinum while the he was in Denmark.  In accordance with the Platinum Defendants' unlawful artifice to further defraud Plaintiffs, the discussions at this meeting consistently were diverted from Platinum's progress on the Pipeline Deals or any other issues of importance and focused instead on resolving the "errors and omissions" of Plaintiffs and Kenyon.  Jan already had resolved the issue involving Kenyon's "misstatements" regarding the Hyperikon valuation by

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

wiring $25,000.00 to Gomez on June 14.  The remaining issue, therefore, was the formal assignment of Gus and Jeff's commission based sales agreements to Platinum. Jan signed all documents Gomez presented to him to accomplish this purpose. Gomez neglected to mention that Gus and Jeff had already been working with Gomez and Trujillo to close potentially lucrative LED lighting sales deals, on behalf of Platinum, with Qualcomm, Inc., in San Diego, and a reputable company called "Intelliswitch" based in Mexico.

70.    Once the parties concluded the matters involving "errors and omissions" of Plaintiffs and Kenyon, Gomez and Trujillo turned their attention to Platinum new proposed Offering terms.  According to Trujillo, Gomez insisted the parties finally formalize and memorialize final agreements regarding Plaintiffs' stock purchase and commission based sales agreements with Platinum.

71.    The final deal, according to Gomez, must be dated "as of May 1, 2013," so Jan's payment plan must be adjusted accordingly.  Jan reluctantly agreed because he feared Gomez otherwise would unilaterally take ownership of all shares of stock previously purchased by Plaintiffs and Kenyon, as the Platinum Defendants had threatened while Jan was in Denmark.  In accordance with the new Offering "deal" reached on July 8, 2013, the parties would proceed with the new Offering terms, only the deal now was effective "as of May 1, 2013" and, consistent with Trujillo's previous promise, Jan's $25,000.00 payment to resolve Kenyon's "misstatements" was applied to the Jan Note.

72.    Therefore, as of July 8, 2013, Plaintiffs and Kenyon purportedly received an initial tranche of 40,332 shares in exchange for $1.375 million, which was allocated 26,200 shares to Jan, and 7,066 shares each to Nicklas and Mr. Kenyon.  The $1.375 million payment was comprised of the $200,000.00 already

COMPLAINT

paid to Gomez, the Jan Note worth $402,650.00, and Hyperikon's assets "worth $772,385.71." [4]

73.     Additionally, as part of this final "Offering," in exchange for future payments of $4,780,080.00 in cash (which could be paid at any time before March 31, 2014 for Jan's shares and anytime before March 31, 2015 for Nicklas's and Kenyon's shares), Plaintiffs and Kenyon could purchase the 79,668 balance of the total 120,000 shares offered in the Offering (or $60 per share) to be allocated 43,800 additional shares to Jan, and 17,934 additional shares each to Nicklas and Kenyon.

74.     Gomez and Trujillo assured Jan he, Nicklas and Kenyon received a great deal.  The Platinum Defendants reiterated how Plaintiffs and Kenyon were actually only paying $1 million in cash up-front in exchange for $2.4 million worth of Platinum stock.   More specifically, Jan transferred to Gomez $225,000 in cash ($100,000 on April 8, another $100,000 on May 6, and another $25,000 on June 14 to resolve Kenyon's "misstatements"), $376,025 in Hyperikon's receivables, and the Jan Note for $402,650.    The total, $1,003,675, comprised Jan's total up-front *cash* commitment in connection with the Offering, according to the Platinum Defendants.  Whereas, Plaintiffs and Kenyon received 40,332 shares which, at $60 per share, were worth $2,419,920.  The Platinum Defendants had absolutely convinced Jan there was no way for him to lose money under these circumstances.

75.     Because Jan agreed to these terms on July 8, 2013, and agreed to make the agreement effective "as of May 1, 2013," Gomez demanded that Jan immediately transfer to Platinum the $6,685 monthly payments Hyperikon received in connection with its accounts receivable for the months of May, June and July.  Therefore, on July 8, 11, and 16, respectively, Jan completed three separate wire transfers to Gomez in

---

[4]  Notably, Gomez never altered or reduced this valuation of Hyperikon's assets, despite his allegations of fraud regarding Kenyon's purported "misstatements," which further underlines the Platinum Defendants' intentional and egregious artifice to defraud Plaintiffs.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

the amount of $6,685 each.  On July 18, 2013, Jan paid Gomez the first $50,000.00 payment on the Jan Note by delivering a check to Gomez at the Gomez Law Group's offices.

76.    Gomez prepared documents purporting to memorialize the parties' agreements and Plaintiffs dutifully signed each document and initialed any pages Gomez indicated should be initialed.   Immediately after Nicklas returned from Denmark on July 15, 2013, he also signed the documents in accordance with Gomez's instructions. At one point, when Jan attempted to read the documents, complained about his poor understanding of English and U.S. legal documents, and asked questions about the provisions concerning commissions, Gomez exclaimed, as he had numerous times in the past, "I am acting as your lawyer and have adequately protected all of your interests.  You do not need to worry about the legalese as I have taken care of everything."   He also stated at this meeting, "I am not making any further changes to these documents so just sign them.  You are getting far more than you deserve as new investors."

77.    Not surprisingly, the central focus of the "agreements" prepared by Gomez was to extract as much cash as possible as quickly as possible from Jan. For example, the accounts receivable of Hyperikon paid approximately $6,685 per month "effective as of May 1, 2013," the first Jan Note payment of $50,000 was payable "upon execution," and Gomez already successfully extracted $225,000 in cash from Jan before finalizing the Offering and purchase of securities by Plaintiffs.  Moreover, the remaining assets of Hyperikon purportedly transferred to Platinum were never formally delivered to Platinum - nor did Gomez or Trujillo further discuss these "assets" with Plaintiffs.  The only assets of any concern to Gomez and Trujillo during this mid-July meeting, and at every other time relevant to this action, were the cash investments, and the monthly payments on the Jan Note and Hyperikon's receivables.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

78.     In connection with all of the foregoing transactions, between April and July 2013, Jan asked Gomez for copies of the numerous asset transfer agreements, the Kenyon Note agreements, the stock purchase agreements, the books and records of the company, and the transfer pricing and product catalogs as between Platinum and Energetic.   Whenever Jan raised these issues, however, Gomez would become irate and Trujillo would demand Jan refrain from spoiling his "deal of a lifetime" by pestering Gomez, again playing "good cop, bad cop" in the Platinum Defendants' artifice to defraud Plaintiffs.   Gomez also repeatedly exclaimed it was his *duty* to maintain all originals and copies of the parties' various documents, *including Plaintiffs stock certificates*, in his capacity as Plaintiffs' attorney for all purposes in connection with Platinum.

79.     Moreover, Gomez expressly stated to Jan and Nicklas, orally at a meeting in person on July 17, 2013, and in writing in a document entitled Shareholders Agreement, signed by the parties on July 17, 2013, that Gomez must maintain custody of all Platinum shareholders' stock certificates to ensure all transfers of company stock "comply with applicable securities laws." For this purported "legal reason," Plaintiffs do not have possession of the stock certificates evidencing their shares of Platinum stock because these stock certificates, according to Gomez, are in the possession of Gomez.

### *The Platinum Defendants' Misrepresentations And Omissions Of Material Facts Regarding Platinum Were Intentionally False And Misleading*

80.     In August 2013, Plaintiffs discovered Defendants' numerous misrepresentations and omissions of material facts regarding Platinum were categorically and intentionally false and misleading for all of the following reasons, among other reasons:

          a.     *First*, Platinum, exclusive Territory did not include India, Denmark or Poland, contrary to the Platinum Defendants' representations to the

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

contrary, described above.   In late June and early July, Jan discovered from a business contact in India that another distributor of Energetic Lighting operated freely in India.   Gomez and Trujillo repeatedly claimed during several meetings in July that although it was true another business was "registered" in India, Platinum still enjoyed the lowest pricing available from Energetic in all countries so this was not a concern of the Platinum Defendants.   Moreover, according to Trujillo, all sales in India were controlled by Mr. Lui, Energetic's Vice President, so Platinum's interests would be protected.   The Platinum Defendants, including Gomez who sat silently and thereby assented to the foregoing statements repeatedly made by Trujillo, consistently represented, however, that Platinum could nevertheless enforce its exclusivity in India at any time it wished.   Then, in or around late July 2013, after Jan repeatedly requested a copy of Platinum's Exclusivity Agreement, Gomez finally presented Jan with a one page document entitled "Amendment No. 1 to Fulfillment Agreement Between Platinum LED US Inc. and Energetic Lighting" (the "Amendment").   The Amendment was dated December 19, 2012 and executed by David Lui as "Vice President" of Energetic Lighting, and by Alvin Gomez as President of Platinum.   The Amendment purported to list every country in Platinum's exclusive Territory.   The Amendment's list of countries did not include Denmark, India, Poland or Turkey, contrary to every written and oral representation made by the Platinum Defendants regarding the Territory prior to Plaintiff's investment;

b.   *Second*, Jan discovered in August 2013 that the Platinum Defendants' $30 million valuation of Platinum, which expressly was based on the Pipeline Deals, was so bogus and artificially inflated that it defied comprehension based on Plaintiffs' understanding of business and legal ethics, and based on Plaintiffs' understanding that Gomez, acting as their attorney, had confirmed the accuracy of this valuation.   In fact, not one of the Pipeline Deals described above ever was realized, and Platinum has not earned any of the promised revenues set forth in

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

the purported "contracts" and "informally closed" deals comprising the Pipeline Deals. Upon information and belief, based on Jan's numerous discussions and emails with Gomez and Trujillo from June to the present date, the only money paid to the Platinum Defendants in connection with Energetic Lighting was a total of $150,000.00, paid in or around July 2013 in connection with the purported SCPPA deal to supply LED lighting to the Anaheim Public Utility. Based on information and belief, however, as described in greater detail below, this purported Platinum deal was, in fact, a contract performed by Energetic, and the $150,000.00 payment constituted a commission payment earned by Trujillo, in his capacity as a Commercial Sales Manager of Energetic;

c.      *Third,* in or mid-August 2013, Jan learned that Energetic could not and was not able to supply Platinum with LED street lighting pre-certified by UL and Energy Star in the United States; nor was Platinum able to obtain LED products certified by NOM and FIDE in Mexico, by TSI in Turkey, by S in Argentina, or by *any* other certifying entity for use in *any* of the countries in which Platinum purportedly had exclusive distributorship rights. The inability or unwillingness of Energetic to supply Platinum with pre-certified LED products for installation in the various countries in Platinum's exclusive Territory is absolutely contrary to the customs and practices of lighting distributorships. For the foregoing reasons, upon information and belief, Platinum does not enjoy a legitimate exclusive distributorship arrangement with Energetic. Otherwise, Energetic could and would supply Platinum with pre-certified products ready for installation in all countries in the Territory. Any other arrangements makes absolutely no financial sense from the perspective of an average reasonable LED lighting distributor;

d.      *Fourth,* in or around August 2013, Jan learned for the first time that his team was not entitled to sell the diverse products at the "cost plus 15%" pricing as represented in the bogus catalogue the Platinum Defendants displayed to

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

Plaintiffs during their late March and early April 2013 meetings, described above. Instead, Jan learned he only was entitled to sell a very limited number of Energetic products. Moreover, pursuant to a memo distributed by Gomez in August 2013, all pricing terms had to be negotiated by Plaintiffs and all Platinum agents "on a case by case" basis subject to the sole discretion and approval of Gomez and David Lui of Energetic;

        e.    *Fifth*, as early as March 2013, Jan knew and understood Trujillo was the Commercial Sales Manager of Energetic Lighting. The Platinum Defendants led Plaintiffs to believe, however, that Trujillo's arrangement whereby he also acted as a distributor through Platinum, was formally approved by Energetic. Upon information and belief, however, Trujillo does not have the approval or endorsement of Energetic to act as a distributor of Energetic products while also acting as a commission based sales person for Energetic. In July 2013, Trujillo revealed to Jan, during meeting at Gomez Law Group's office, that Platinum was expected to pay a small portion of any commissions earned on its sales of Energetic products to David Lui. An additional "cut" of Platinum's commissions earned on internet sales was to be paid to yet another Energetic employee named Fernando Segura. The amount paid to these individuals was not established by contract but rather, according to Trujillo, simply was "expected" and a cost of doing business "on such favorable terms." For the foregoing reasons, Plaintiffs now are informed and believe Trujillo and Gomez are involved in an illegal "kick-back" scheme with Mr. Lui and perhaps others at Energetic, whereby Lui approves favorable pricing to Platinum in exchange for a cut of the profits, all without the knowledge and approval of Energetic or its publicly traded parent company;

        f.    *Sixth*, in August 2013, Nicklas and Jan both discovered that Platinum and 1000 Bulbs, Ltd., are not, in fact, the sole and exclusive distributors of Energetic products. On the contrary, several if not dozens of distributors offer

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

Energetic products for sale, including eBay, Amazon, and Lowe's, and many of the prices offered by these additional Energetic distributors are below or equal to the prices Platinum can offer based on the transfer pricing offered by Energetic, which absolutely and universally is greater than "cost plus 15%";

g.     *Seventh*, contrary to the numerous representations made by Gomez that he was acting as the attorney for Plaintiffs in all aspects of the Platinum Offering, and Gomez's actual formal retainer by Plaintiffs to act as their trust and corporate attorney in the Platinum transaction, Plaintiffs now are informed and believe that Gomez was not acting as their attorney and fiduciary and, on the contrary, Gomez engaged in numerous acts and transactions to benefit his own interests at the cost of Plaintiffs, as described in detail above.  Moreover, Plaintiffs discovered in September 2013 that Gomez's representations to Plaintiffs, described in detail above, that Jan, Nicklas, and Kenyon had engaged in various fraudulent activities, thereby exposing themselves and Platinum to "potential criminal and civil liability," were nothing more than an artifice to defraud Plaintiffs, which Gomez accomplished via his "good cop bad cop" routine in concert with Trujillo;

h.     *Eighth*, Gomez represented orally in meetings, and in writing in the Shareholders Agreement, all in mid-July 2013, the Platinum Offering complied with all applicable Federal and State securities laws.  Gomez's representations in this regard were categorically false because the Offering was not registered with the SEC or California Department of Corporations, nor was the Offering exempt from registration.  Plaintiffs never would have proceeded with their investments in Platinum had they known the Offering was unlawful and all investors purchasing shares of Platinum therein were thereby entitled to rescission of their investments.

81.     In or around September 2013, Plaintiffs discovered Trujillo was found liable in a recent State Court action, entitled *Demler v. International Solar Group*, *Inc.*, arising out of a similar business fraud and judgment was entered against Trujillo

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

1  in the amount of approximately $250,000.00.  The amount of the judgment against

2  Trujillo, which formally was entered in January 2013, coincidentally was

3  approximately the exact same amount the Platinum Defendants ultimately extracted

4  from Plaintiffs in up-front cash.  For this reason, Plaintiffs are informed and believed

5  Trujillo and Gomez conspired to extract cash from Plaintiffs sufficient to pay

6  Trujillo's judgment creditors in the *Demler* case.

7       82.  Jan also learned from Trujillo himself, during a meeting at Gomez Law

8  Group's office in late July 2013, that Trujillo held his shares of Platinum in a trust

9  held in the name of his son, who shared his same name ("Trujillo Jr.").  He admitted

10  that he transferred his shares to Trujillo Jr. for the sole and express purpose of

11  avoiding and evading his creditors, including judgment creditors such as the *Demler*

12  creditors and judgment creditors in another case Trujillo vaguely described to Jan.

13       83.  In or around early September 2013, Gomez stated to Jan and Nicklas that

14  he intended to take out a line of credit to assist Platinum with purchasing products for

15  sale in connection with its Energetics distributorship.  According to Gomez,

16  Platinum's funds were depleted and it was unable to fund any further travel by

17  Trujillo to Mexico to "close" the Pipeline Deals.  Based on Gomez's

18  acknowledgement that Platinum now is taking on debt and has liabilities greater than

19  its assets, Plaintiffs are informed and believe Platinum is insolvent.  For this reason

20  and all of the foregoing reasons, Plaintiffs are informed and believe and thereon

21  allege their investments in Platinum are now worthless.

22       84.  By this Complaint, Plaintiffs formally tender all shares of Platinum stock

23  held in Plaintiffs' names on the books and records of the company back to Gomez,

24  Trujillo and Platinum in exchange for complete rescission of all of Plaintiffs'

25  investments in the Offering described herein.  Plaintiffs will execute such further

26  documentation, if any, the Platinum Defendants deem necessary in furtherance of this

27  purpose.  Plaintiffs otherwise take the position they effectively hereby have tendered

28

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

all shares of stock purchased in the Platinum Defendants unlawful offering of Platinum securities to the original issuers, offerors and sellers of such stock, in exchange for rescission of their investments, consistent with the Federal and State statutory provisions cited herein.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
(VIOLATION OF THE SECURITIES AND EXCHANGE ACT OF 1933, 15 U.S.C. § 77a, et seq., and REGULATION D, 17 C.F.R. § 230.500, et seq.)

85.    As described above, Defendants offered and sold securities in interstate commerce by utilizing the United States telephone systems, email, internet, related interstate wire systems, to conduct an ongoing and continuous securities offering.

86.    Defendants offering and sales of Platinum securities alleged herein constituted a collective, aggregate offering, in excess of $6 million, that was not registered with the Securities Exchange Commission pursuant to the Securities and Exchange Act of 1933, 15 U.S.C. § 77a, et seq., nor was the offering qualified for an exemption from registration.

87.    Plaintiffs, therefore, are entitled to rescission of any and all purchases of Platinum securities in connection with the Offering, with interest thereon.

### SECOND CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
(VIOLATIONS OF THE SECURITIES AND EXCHANGE ACT OF 1934, Rule 10(b) and S.E.C. Rule 10b-5; 15 U.S.C. § 78j(b), et seq., and 17 C.F.R. § 240.10b-5)

88.    Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

89.    Pursuant to Rule 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), et seq., it is unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, to use or employ, in

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

connection with the purchase or sale of securities, any manipulative or deceptive device, artifice to defraud, or contrivance in contravention of the rules and regulations prescribed by the Securities and Exchange Commission (the "SEC") for the protection of investors.

90.    The Platinum Defendants' wrongful misconduct, as alleged above, violated the foregoing sections of the Securities and Exchange Act of 1934.   In particular, the Platinum Defendants engaged in hard-sell tactics and intentionally and willful implemented a "good cop, bad cop" artifice to defraud Plaintiffs, as described above, and thereby defrauded Plaintiffs to their substantial damage in an amount to be proven at trial.   Moreover, Plaintiffs reasonably relied on all of the Platinum Defendants' misrepresentations and omissions of material facts, particularly alleged above, which statements and omissions were made intentionally to defraud Plaintiffs, and which statements and omissions proximately caused Plaintiffs' investment losses.

91.    More specifically, the financial losses suffered by Plaintiffs were proximately caused by Defendants' misrepresentations because not a single one of the actual or prospective contracts identified in the Pipeline Term Sheet ever was executed, performed, or resulted in any pecuniary gain for Platinum or the Plaintiffs.   As a result of the Defendants misrepresentations regarding the Pipeline deals, Platinum now has expended every penny of Plaintiffs' capital contributions to the company.   Moreover, the recent statements by Gomez that Platinum recently has borrowed substantial sums of money to pay for unused inventory confirms Platinum is now defunct and, as a result, Plaintiffs have lost their entire investment.

### THIRD CAUSE OF ACTION
Against Defendants Alvin Gomez and Fernando Trujillo
(CONTROL PERSON LIABILITY UNDER SECURITIES AND EXCHANGE ACT, SECTION 20(a), 15.U.S.C. §78t(a))

92.    Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

93. Pursuant to the Control Person Liability Section 20(a) of the Securities and Exchange Act of 1934:

> "Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable…unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

94. As alleged above, each of the Platinum Defendants directly and indirectly controlled each of the other Platinum Defendants and therefore all Platinum Defendants are jointly and severally liable for Plaintiffs' damages alleged herein.

## FOURTH CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
(RESCISSION; VIOLATION OF CAL. CORP. CODE § 25000, et seq.)

95. Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

96. The Offering constituted a collective, aggregate offering that was not registered with the SEC pursuant to the Securities Act of 1933, 15 U.S.C. § 77a, et seq., or qualified by the California Department of Corporations pursuant to the California Corporate Securities Law, Cal. Corp. Code § 25000, et seq. Defendants' collective offering was not otherwise exempt from registration with the SEC or from qualification under Cal. Corp. Code § 25000, et seq.

97. As a direct and proximate result of Defendants' actions, Plaintiffs are entitled to rescission of their investments, with interest, pursuant to Cal. Corp. Code § 25501.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

FIFTH CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
(VIOLATIONS OF CAL. CORP. CODE § 25401 AND JOINT AND SEVERAL
LIABILITY FOR AIDING AND ABETTING PURSUANT TO § 25504.1)

98.     Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

99.     The Platinum Defendants, and each of them, violated California Corporations Code § 25401 by offering to sell securities to Plaintiffs by means of misrepresented material facts and omissions.

100.   At the time these Defendants made these misrepresentations, they knew or should have known in the exercise of reasonable care that the representations were false, misleading, and material.  These Defendants intended to defraud and deceive Plaintiffs through their misrepresentations.

101.   Plaintiffs justifiably relied on these Defendants' misrepresentations in deciding to invest in Platinum.

102.   Through their actions as alleged herein, each of these Defendants did materially aid, abet and assist each other Platinum Defendant in violation of Cal. Corp. Code § 25401, each with the intent to deceive and defraud Plaintiffs.  Pursuant to Cal. Corp. Code § 25504.1:

> "Any person who materially assists in any violation of Section 25110, 25120, 25130, 25133, or 25401, or a condition of qualification under Chapter 2 (commencing with Section 25110) of Part 2 of this division imposed pursuant to Section 25141, or a condition of qualification under Chapter 3 (commencing with Section 25120) of Part 2 of this division imposed pursuant to Section 25141, or an order suspending trading issued pursuant to Section 25219, with intent to deceive or defraud, is jointly and severally liable with any other person liable under this chapter for such violation."

103.   As a direct and proximate result of the Platinum Defendants' misrepresentations, Plaintiffs were harmed in an amount according to proof, to which

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

they are entitled pursuant to Cal. Corp. Code § 25500, et seq. The Platinum Defendants are jointly and severally liable for the full amount of Plaintiffs' damages pursuant to Cal. Corp. Code § 25504.1.

SIXTH CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo
(CONTROL PERSON LIABILITY PURSUANT TO CAL. CORP. CODE § 25504)

104. Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

105. Pursuant to California Corporations Code § 25504:

"Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist."

106. As alleged above, each of the Platinum Defendants directly and indirectly controlled each of the other Platinum Defendants and therefore all Platinum Defendants are jointly and severally liable for Plaintiffs' damages alleged herein.

SEVENTH CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
(VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS
CODE § 17200, et seq., FOR UNLAWFUL, FRAUDULENT,
AND UNFAIR BUSINESS ACTS AND PRACTICES)

107. Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

- 44 -

108.   The Platinum Defendants' acts and practices as described herein constitute unlawful, fraudulent, and unfair business acts and practices, in that (1) the Platinum Defendants' practices, as described herein, violate each of the statutes set herein; and/or (2) the justification for these Defendants' conduct is outweighed by the gravity of the consequences to Plaintiffs and members of the public at large; and/or (3) these Defendants' conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and members of the public at large; and/or (4) these Defendants' conduct is fraudulent, untrue, and misleading and has a tendency to deceive Plaintiffs and the public at large.  Such conduct violates California Business and Professions Code section 17200 et seq.

109.   Plaintiffs alleges that, unless this Court enjoins Defendants from engaging in the wrongful conduct alleged herein, the general public will be harmed and deceived by Defendants' s fraudulent misconduct.

110.   Plaintiffs have suffered injury in fact as a result of the unlawful, unfair, and fraudulent business acts described herein.  Pursuant to California Business and Professions Code sections 17200 and 17203, Plaintiffs seek relief as prayed for below.

EIGHTH CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
(VIOLATION OF CALIFORNIA PENAL CODE  § 496(a))

111.   Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

112.   As alleged above, Defendants received Plaintiffs' property by false pretenses in violation of Penal Code § 496(a).  Plaintiffs suffered substantial monetary damages as a result of Defendants' violation of Penal Code § 496(a). Pursuant to the express provisions of Penal Code § 496(a), therefore, Plaintiffs are

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

1   entitled to recover three times the amount of their actual damages, along with the

2   costs they have incurred in bringing this suit, including reasonable attorney's fees.

### NINTH CAUSE OF ACTION
### Against Defendant Alvin Gomez
### (BREACH OF FIDUCIARY DUTY)

113.   Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

114.   Defendant Gomez owed Plaintiffs fiduciary obligations of the utmost loyalty and due care requiring Gomez to control and manage the Offering and Platinum's business practices in general in a fair and equitable manner, and to act in furtherance of the best interests of Plaintiffs and not in furtherance of his own personal benefits or interests at Plaintiffs' expense.

115.   Defendant Gomez intentionally and recklessly breached his fiduciary duties as alleged herein, proximately causing Plaintiffs substantial monetary harm.

116.   This Defendant's disregard for his fiduciary duties, as described herein, resulted in harm to Plaintiffs, in an amount according to proof at trial.

### TENTH CAUSE OF ACTION
### Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
### (FRAUDULENT MISREPRESENTATION)

117.   Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

118.   Defendants committed fraudulent misrepresentations as alleged with particularity above.   At the time Defendants made these misrepresentations, they knew or should have known in the exercise of reasonable care that the representations were false, misleading, and material.   Defendants intended to defraud and deceive Plaintiffs, and to induce them to invest in Platinum, and to enter into commission sales agreements with Platinum, through their misrepresentations.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

119.   Defendants' misrepresentations were in fact material to Plaintiffs' decisions to invest in Platinum, and to enter into commission sales agreements with Platinum, and Plaintiff actually and justifiably relied on the misrepresentations in connection with these decisions.

120.   Defendants are liable to Plaintiffs under this cause of action under the principles of direct misrepresentation and fraud in the inducement.   Plaintiffs may therefore elect to rescind the various purported agreements between all parties or enforce the agreements and sue for monetary damages.   As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have been harmed in an amount according to proof.

121.   Defendants' actions were intentional, fraudulent, willful, wanton, malicious, oppressive, and reckless, thus warranting punitive damages.

ELEVENTH CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
(CONVERSION, CIVIL CONSPIRACY AND AIDING AND
ABETTING TORTIOUS MISCONDUCT)

122.   Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

123.   The conduct of the Platinum Defendants, as described herein, including but not limited to conversion, and the fraud and breaches of duties alleged above, was a result of conscious decisions to participate in the schemes as alleged above, for the purpose of assisting, and which did assist substantially the furtherance of, the alleged tortious misconduct, and the joint venture arrangement and conspiracy between and among the Platinum Defendants.

124.   By virtue of the foregoing, Plaintiffs have suffered substantial loss and damage.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

125.   The Platinum Defendants' actions were intentional, fraudulent, willful, wanton, malicious, oppressive, reckless, and performed with an evil mind warranting punitive damages.

### TWELVTH CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
(BREACH OF CONTRACT)

126.   Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

127.   Defendants' actions as alleged herein constitute breaches of the written and oral promises made by Defendants to Plaintiffs in connection with his investments.

128.   As a direct and proximate result of Defendants' breaches, Plaintiffs have been harmed in an amount according to proof, including but not limited to actual damages, general damages, interest, and other charges due under the terms of the parties' agreements.

### THIRTEENTH CAUSE OF ACTION
Against Defendants Alvin Gomez, Fernando Trujillo, and Platinum LED
(ACCOUNTING/FAILURE TO PAY DISTRIBUTIONS PURSUANT TO
CALIFORNIA CORPORATIONS CODE § 500, et seq.)

129.   Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

130.   Defendants failed to provide Plaintiffs access to correct, accurate, and current versions of Platinum's books and records or the various agreements with Plaintiffs.

131.   Because Defendant has not disclosed the relevant information regarding Platinum's assets, liabilities, expenses, and earnings, the monetary value of Plaintiffs' investment interest cannot be ascertained and likely only can be ascertained by a full and detailed accounting of Platinum.

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

132.   Plaintiffs demand and are entitled to an accounting of all assets, liabilities, expenses, and earnings of Platinum, Gomez and Trujillo.

## FOURTEENTH CAUSE OF ACTION
### Against All Defendants
### (PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF)

133.   Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

134.   Defendants and Plaintiffs have an actual and existing dispute regarding the enforceability of the various contracts between and among them, including, without limitation, the Shareholders Agreement and the commissions sales agreements purportedly entered into by and between Plaintiffs and Platinum.  The agreements should be rescinded as a result of the Defendants' deliberately fraudulent misconduct.   These acts have caused and, unless restrained by this Court by a preliminary injunction and permanent injunction, will continue to cause Plaintiffs to suffer irreparable injury.

135.   Plaintiffs have no adequate remedy at law.   Damages at law are inadequate.   Plaintiffs therefore seek injunctive and/or other appropriate equitable relief from this Court.

## FIFTEENTH CAUSE OF ACTION
### Against All Defendants
### (UNJUST ENRICHMENT AND IMPOSITION OF CONSTRUCTIVE TRUST)

136.   Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

137.   Defendants conduct as alleged herein constitutes unjust enrichment under the laws of the State of California.

138.   As a direct and proximate result of Defendants' conduct, and the events alleged herein, Plaintiffs have been harmed in an amount according to proof, and will

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

suffer further, irreparable injury unless the requested relief is granted.  Accordingly, Plaintiffs demand that a constructive trust be imposed for Plaintiffs' benefit on all investment proceeds or monies held and/or shown to have been transferred by and between accounts controlled by Gomez and Trujillo for these Defendants' benefit, and also upon any revenues derived from the business activities of the Platinum Defendants.

139.   Defendants conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced and punitive damages and attorneys' fees.

### SIXTEENTH CAUSE OF ACTION
### Against All Defendants
### (DECLARATORY RELIEF)

140.   Plaintiffs incorporate each of the foregoing paragraphs in support of this claim for relief.

141.   A dispute has now arisen between the parties regarding the respective rights of each of the parties.  A judicial declaration is therefore required declaring that: (1) Defendants have no right to enforce any obligations or duties purportedly owed by Plaintiffs to any of the Defendants pursuant to any agreements entered into by and between the parties; (2) Plaintiffs are entitled to rescind the Kenyon Note and all monies loaned thereunder and transferred to the Platinum Defendants shall be returned forthwith to Plaintiffs; and (3) Plaintiffs are entitled to be compensated by Defendants for the wrongful distributions of the funds raised in the Offering.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

### DEMAND/PRAYER FOR RELIEF

For general damages, including statutory damages, in a sum in excess of the jurisdictional minimum of this Court, according to proof;

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

1   For compensatory damages in excess of the jurisdictional minimum of this

2   Court, according to proof;

3   For consequential damages in excess of the jurisdictional minimum of this

4   Court, according to proof;

5   For an accounting, as necessary;

6   For an order that Defendants, and their agents, employees, servants,

7   representatives, successors in interest, and all those in concert with Defendants, be

8   permanently enjoined from engaging in the conduct set forth herein: including

9   offering or selling Platinum securities, attempting to enforce any purported

10   agreements purportedly entered into by and between the parties; further engaging in

11   unfair competition against Plaintiffs; and assisting, aiding, or abetting any other

12   person or business entity in engaging in or performing any of the activities referred to

13   herein;

14   Plaintiffs be awarded three times the amount of their actual damages, along

15   with the costs they have incurred in bringing this suit, including reasonable attorney's

16   fees pursuant to Penal Code § 496(a);

17   Plaintiffs be awarded statutory remedies pursuant to Sections 17200, et seq.,

18   including restitution and injunctive relief;

19   Plaintiffs recover their reasonable attorneys' fees, costs, and expenses incurred

20   herein, as appropriate under the exceptional circumstances of this case;

21   Plaintiffs be awarded prejudgment and post-judgment interest at the legal rate;

22   Plaintiffs recover such other and further relief as this Court deems just and

23   proper.

24

25

26

27

28

THE FROST FIRM
1010 Second Avenue, 24th Floor
San Diego, CA 92101
TELEPHONE (619) 822-1740 · FACSIMILE (619)822-1744

1

2    DATED:   September 19, 2013

3                                                Submitted by,

4                                                THE FROST FIRM
                                                 THOMAS C. FROST
5

6

7                                                _____
                                                      s/ THOMAS C. FROST
                                                      THOMAS C. FROST
8
                                                 1010 Second Ave., 24th Floor
9                                                San Diego, CA 92101
                                                 Telephone: 619-822-1740
10                                               Facsimile: 619-822-1741
11
                                                 *Attorneys for Plaintiffs*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT